IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MICKEY MASON,

      Plaintiff,

v.

JUSTIN SNELL, ZACHARY FENTON, NATHAN MCCARTHY, ZACHARY FITZGERALD, PHILIP ROYSTER, MORGAN CANNON, and JACQUELINE LASHBROOK,

      Defendants.

Case No. 3:19-CV-1019-NJR

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Mickey Mason, an inmate of the Illinois Department of Corrections (IDOC), filed this lawsuit pursuant to 42 U.S.C. § 1983.[1] He alleges that prison officials retaliated against him for exercising his First Amendment rights and were deliberately indifferent to conditions of confinement that violated the Eighth Amendment.

Before the Court are two motions for summary judgment. The first was filed by Defendants Justin Snell, Zachary Fenton, Nathan McCarthy, Zachary Fitzgerald, Philip Royster, and Jacqueline Lashbrook (collectively, the "IDOC defendants"). (Docs. 156, 157). The second was filed by Defendant Morgan Cannon (Docs. 158, 159). Mason has filed a response in opposition to summary judgment (Doc. 168), to which both Cannon (Doc. 169) and the IDOC defendants (Doc. 172) have replied.

---

[1] Although he initially proceeded *pro se*, the Court recruited counsel for Mason in April 2020. (Docs. 61, 67).

BACKGROUND[2]

At all times relevant to this action, Mason was incarcerated at Menard Correctional Center ("Menard") (Doc. 157, ¶ 1). On September 25, 2020, with the assistance of counsel, Mason filed an amended complaint raising the following claims:

**Count I:** First Amendment retaliation against Defendants McCarthy, Snell, Fenton, Lashbrook, and Fitzgerald.

**Count II:** Deliberate indifference to inhumane conditions of confinement in violation of the Eighth Amendment against Defendant Cannon.

**Count III:** Deliberate indifference to inhumane conditions of confinement in violation of the Eighth Amendment against Defendants Fitzgerald and Royster.

(Docs. 77, 104).[3]

### A. Count I

Mason claims in his first count that Defendants McCarthy, Snell, Fenton, Lashbrook, and Fitzgerald—five IDOC officials then working at Menard (Doc. 157, ¶¶ 2–7)—retaliated against him for activity protected by the First Amendment. (Doc. 77, ¶¶ 65–72). Prior to this complaint, Mason filed multiple lawsuits against Menard officials. (*See* Doc. 157, ¶¶ 9, 18–20; Doc. 159-1, at 4, 10). Mason argues that these lawsuits gave rise to the following conduct by each defendant:

---

[2] The facts that follow are undisputed except where otherwise noted.
[3] This description of the outstanding counts and defendants only includes claims that are still pending after this Court's disposition (Doc. 104) of previous motions for summary judgment on the issue of exhaustion of administrative remedies (Docs. 87, 92).

i. *McCarthy*

Prior to the events at issue, Mason had never had any interaction with Defendant Nathan McCarthy, a correctional officer in either the internal affairs or intel unit at Menard. (Doc. 157, ¶¶ 5, 10–11). But on November 7, 2018, McCarthy walked past Mason's cell twice, each time stating "you're dead." (Doc. 157, ¶ 10; Doc. 159-1, at 10–11). Mason believes these statements were made in retaliation for a previous lawsuit he filed against one of McCarthy's coworkers in internal affairs. (Doc. 157, ¶ 11; Doc. 159-1, at 10).

ii. *Snell*

Defendant Justin Snell was a correctional sergeant at Menard. (Doc. 157, ¶ 7). Prior to the events at issue, Snell was named as a defendant by Mason in two separate lawsuits. *Id.* ¶¶ 18–20. One suit, to which Snell was joined by an amended complaint on February 26, 2018, was dismissed before he had been served. *Id.* ¶ 19. The other suit was filed on October 29, 2018, and Snell indicated his receipt of the complaint by signing a waiver of service on January 14, 2019. *Id.* ¶ 20.

The events giving rise to Mason's claim against Snell happened a few weeks after that second lawsuit was filed. On or about November 19, 2018, Snell blocked Mason's way to the law library. *Id.* ¶ 13. Mason was carrying envelopes (Doc. 159-1, at 11–12; *see* Doc. 157, ¶ 13), which a Procedural Bulletin had banned from prison libraries (Doc. 157, ¶ 12).[4] Snell told Mason he could not take his envelopes to the library and ordered him to return to his cell. (Doc. 157, ¶ 12; Doc. 159-1, at 11; *see* Doc. 157-3).

---

[4] The Procedural Bulletin forbidding envelopes in the library, issued on March 28, 2017, reads in relevant part:

What happened next is disputed. During his deposition, Mason testified that he followed Snell's orders and returned to his cell (Doc. 159-1, at 11), though perhaps not without some "back and forth," *id.* at 12. Once in his cell, Mason asked to speak with someone higher up in the chain of command—a lieutenant or major. *Id.* According to Mason, Snell's response was to point a finger at him and say Mason had listed him as a defendant. *Id.* The IDOC defendants, on the other hand, argue that Snell must not have made the alleged remark, as he had not been served with a lawsuit at that time. (Doc. 157, at 13–14).

It is undisputed, however, that Snell then ordered Defendant Fenton to take Mason's ID so that Snell could write him up for a disciplinary report, *id.* ¶ 15, as the Procedural Bulletin required (Doc. 157-3). Mason was sent to segregation shortly thereafter. (Doc. 159-1, at 11). Snell's disciplinary report charged Mason with "intimidation and threats" and "disobeying a direct order essential to safety and security." (Doc. 157, ¶ 16; Doc. 157-4). The adjustment committee found Mason guilty of these violations, a determination ultimately approved by Defendant Lashbrook.[5] (Doc. 157, ¶ 17; Doc. 157-4).

---

Effective immediately, offenders <u>will no longer be permitted</u> to use . . . any . . . type of envelope, folder, or file to transport paperwork to and from the library and/or law library. This includes library and law library workers.

Staff are required to ensure offenders do not have any type of envelope, file, or folder when leaving the cellhouse on a library or law library pass. Any offender attempting such will be escorted back to their cell, and a disciplinary report will be issued for violation of rules.

(Doc. 157-3; Doc. 157, ¶ 12).
[5] Mason testified that he believes the charges were falsely made up by Snell to have him wrongfully sent to segregation. (Doc. 159-1, at 11).

iii.  *Fenton*

Defendant correctional officer Zachary Fenton first became involved when he followed Defendant Snell's directions to take Mason's ID.[6] (Doc. 157, ¶¶ 2, 15; Doc. 159-1, at 7). When asked what retaliatory acts Fenton had taken beyond following Snell's order, Mason testified that he told Fenton about the conditions of his segregation cell. (Doc. 159-1, at 12). In response to his concerns, Fenton brought Defendant Cannon to see Mason but did nothing else to help him.[7] *Id.*

Though Mason testified to no other alleged retaliatory acts by Fenton, Mason mentioned Fenton in a sworn letter to the prison administration. (Doc. 1-1, at 19–20). In that letter, which was sent November 27, 2018, Mason stated that Fenton had walked past his cell multiple times after taking his ID. *Id.* Mason again requested to speak with a lieutenant or major. *Id.* at 20. Fenton then said he was going to "send [Mason's] ass to seg[regation] behind the door." *Id.*

Fenton was never a defendant in one of Mason's lawsuits prior to this one. (Doc. 159-1, at 12). Fenton never mentioned any of Mason's previous lawsuits to Mason. *Id.*

---

[6] In a sworn letter sent to the prison administration on November 27, 2018, Mason stated that he had not yet been given back his ID after Fenton had taken it. (Doc. 1-1, at 19). At Mason's deposition on May 8, 2023, however, he testified that his ID had been returned to him. (Doc. 159-1, at 11).

[7] In their motion for summary judgment, the IDOC defendants decline to address Mason's deposition statements about his interactions with Fenton while in segregation. (Doc. 157, at 16 n.7). They explain that this Court's prior order dismissed all claims against Fenton with respect to his conduct while Mason was in segregation. *Id.* (citing Doc. 104). But they are mistaken. This Court's prior order held, in relevant part, that "Mason exhausted his administrative remedies as to his claims in Count I against . . . Fenton, but . . . not . . . his claims in Count II against Fenton." (Doc. 104, at 8). Count II concerns allegations of deliberate indifference to unconstitutional conditions of confinement in segregation, whereas Count I concerns retaliation. (Doc. 77). Because Fenton's allegedly retaliatory conduct is at issue in Count I, not Count II, Mason's claims concerning that conduct were not dismissed by this Court's prior order.

### iv.  *Lashbrook*

Jacqueline Lashbrook was the Warden at Menard during the events at issue. (Doc. 157, ¶ 4). Mason testified in his deposition that Lashbrook retaliated against him by failing to stop the alleged retaliation of other IDOC officials. (Doc. 159-1, at 12).

### v.  *Fitzgerald*

On or around November 27 or 28, 2018, Mason was transferred from segregation to the West Cellhouse. (Doc. 159-1, at 14–15). While there, he began to experience issues[8] with the flow of water to his cell and with an intermittent smell of Mace.[9] *Id.* at 14–18. Mason complained about his cell's conditions to Zachary Fitzgerald (Doc. 157, ¶ 26; Doc. 159-1, at 13–18), a correctional officer whom Mason had named in a previous lawsuit (Doc. 157, ¶¶ 4, 27; Doc. 159-1, at 7, 13–14).

While it is undisputed that Mason told Fitzgerald about his water issues (Doc. 157, ¶ 26), Mason testified both (1) that he alerted Fitzgerald to the smell of Mace, and (2) that he could not remember whether he had done so (*compare* Doc. 159-1, at 13, *and* Doc. 157, ¶ 26, *with* Doc. 159-1, at 18, *and* Doc. 157, ¶ 31). Fitzgerald did not do anything to resolve Mason's complaints. (Doc. 157, ¶ 26; Doc. 159-1, at 14).

Fitzgerald never spoke to Mason about the lawsuit against him. (Doc. 159-1, at 13–14). However, the smell of Mace only appeared after Fitzgerald was assigned to the cellhouse. *Id.* at 13.

---

[8] Discussed more thoroughly in the background to Count III, *infra*.

[9] Mace is a brand of pepper spray. *What Is the Difference Between Mace and Pepper Spray?*, MACE: SELF DEFENSE TRAINING (Feb. 16, 2022), https://www.mace.com/blogs/self-defense-training/what-is-the-difference-between-mace-and-pepper-spray.

### B.  Count II

Mason claims in his second count that he was subjected to unconstitutional conditions while in segregation. (Doc. 77, ¶¶ 39–40, 42–43, 47–48, 53, 73–80). Defendant Morgan Cannon, a Behavioral Health Technician at Menard,[10] was responsible for checking in on Mason during his time in segregation and documenting and reporting any complaints. (Doc. 159, ¶¶ 2–3; *see id.* ¶¶ 7–13). Mason alleges that Cannon falsified her reports of his complaints and ignored his concerns, thus exhibiting deliberate indifference to the unconstitutional conditions in his cell. (Doc. 77, ¶¶ 73–80; Doc. 159, ¶ 4).

Mason testified that his segregation cell was very cold and lacked heating (*E.g.*, Doc. 159-1, at 22, 26; *see* Doc. 159, ¶ 4) and that he was not given bed material, sheets, or a blanket. (Doc. 159-1, at 26). He claimed he did not have access to toiletries (Doc. 159, ¶ 4) like a toothbrush or "shower soap" (Doc. 159-1, at 22), and that there was dried blood on his bed mat and cell walls. (Doc. 159-1, at 22; Doc. 159, ¶ 4). According to Mason, these conditions caused him to suffer cold feet, a sore throat, headaches, chills, a lack of sleep, and cold and fever symptoms. (Doc. 159-1, at 26).

Mason saw Cannon twice while in segregation. (*See* Doc. 1-1, at 18). What Mason said to Cannon is disputed. He claims he complained about the conditions in his cell. (*E.g.*, Doc. 159-1, at 22). However, for each visit to Mason's cell, Cannon prepared a brief report. (Doc. 1-1, at 18). In each such report, Cannon reported the cell's condition as "[g]ood" and wrote that Mason had remarked "I'm good." *Id.* On both dates, she

---

[10] Cannon was at all relevant times employed by non-party Wexford Health Sources, Inc. (Doc. 159, ¶¶ 2–3).

indicated there was "[n]o action required." *Id.* And Cannon testified that, though she did not remember Mason or visiting his segregation cell (Doc. 159-2, at 12–13), she would have written in her report whatever was said to her by an inmate verbatim, *id.* at 23.[11]

### C.  Count III

Mason claims in his third count that he was subjected to unconstitutional conditions while in the West Cellhouse. (Doc. 77, ¶¶ 57–64, 81–86). He alleges that his complaints were ignored with deliberate indifference by Defendants Zachary Fitzgerald and Philip Royster. (Doc. 77, ¶¶ 81–86).

On May 9, 2019, Mason began to experience issues with the flow of water in his cell. (Doc. 157, ¶ 21). Mason's cell had both a sink and a toilet, each of which was normally connected to running water. (Doc. 159-1, at 16). Though his complaint alleges that the cold water in his sink was turned off (Doc. 77, ¶ 58), Mason testified that he could not remember whether his sink had any running water (Doc. 157, ¶ 23; Doc. 159-1, at 15–16). It is undisputed that his toilet continued to function, however. (Doc. 157, ¶ 23; Doc. 159-1, at 16). Mason was able to secure sufficient water for his washing, cooking, and drinking needs from the neighboring inmates, who were not experiencing water issues. (Doc. 159-1, at 16; *see* Doc. 157, ¶ 24).

Mason told both Fitzgerald and Royster about his issues with the flow of water in his cell. (*E.g.*, Doc. 159-1, at 16). Royster fixed the issue with Mason's water on May 26,

---

[11] While a dispute exists as to what Mason told Cannon, as well as whether Cannon's reports were truthful, it is undisputed that Cannon did not have the authority to resolve any of Mason's complaints about the cell. (Doc. 159, ¶¶ 5–12).

2019. (Doc. 157, ¶ 25; Doc. 77, ¶ 64; Doc. 159-1, at 16 (stating in deposition testimony that the date the water was turned back on was written in his complaint)).

During Mason's stay in the West Cellhouse, there was an incident where he was able to smell Mace while in his cell. (Doc. 159-1, at 17; *see* Doc. 157, ¶¶ 26–27, 29–32). Mason testified that he and his neighbors all began to cough, and that he smelled it strongest near the vent by his bed. (Doc. 159-1, at 17). He claims that this occurred more than once, *id.*, though he acknowledged that the smell of Mace is not atypical in the prison (Doc. 157, ¶ 32). According to Mason, after alerting staff to the smell (Doc. 157, ¶ 31; Doc. 159-1, at 17) and asking whether it had been sprayed in response to an altercation, he was told there had not been one. (Doc. 159-1, at 17–18). This led him to believe that Mace had been intentionally sprayed into the vent of his cell (though he could not identify who might have sprayed it). (Doc. 159-1, at 17–18). As a result of the smell, Mason testified that he experienced coughing and difficulty breathing, though he did not recall seeking medical attention for these issues. *Id.* at 18

i. *Fitzgerald*

Despite having alerted "staff" in general, Mason testified both that he told Fitzgerald about the smell of Mace and that he could not remember whether he had told him. (*Compare* Doc. 159-1, at 13, *and* Doc. 157, ¶ 26, *with* Doc. 159-1, at 18, *and* Doc. 157, ¶ 31). Fitzgerald did not do anything to resolve Mason's complaints. (Doc. 157, ¶ 26).

ii. *Royster*

Mason testified that he could not remember whether he had told Royster about the smell of Mace. (Doc. 157, ¶ 31; Doc. 159-1, at 18).

<u>LEGAL STANDARDS</u>

**A.  Summary Judgment**

Summary judgment is proper only if the moving party can demonstrate, through pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). "A genuine dispute over a material fact exists if 'the evidence is such that a reasonable jury could return a verdict' for the nonmovant." *Machicote v. Roethlisberger*, 969 F.3d 822, 827 (7th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material if it might affect the outcome of a suit under the relevant substantive law. *Ruffin-Thompkins*, 422 F.3d at 607.

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *See Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012); *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014). But "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014).

The moving party bears the burden of establishing that no material facts are in

genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160–61 (1970); *see also Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004). Once the moving party sets forth the basis for summary judgment, the burden shifts to the nonmoving party, who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp.*, 477 U.S. at 322–24.

A moving party is entitled to judgment as a matter of law where the nonmoving party "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. The party opposing summary judgment must offer admissible evidence in support of his or her version of events; hearsay evidence does not create a genuine issue of material fact and cannot be considered on summary judgment. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *see also Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023).

## DISCUSSION

To begin, this Court must address a problem with Mason's responsive brief. As explained below, the brief neither complies with local rules governing the assertion of material facts nor supports those assertions with specific citations to materials in the record.

First, Mason's brief failed to follow the local rules for briefs opposing summary judgment. Under those rules, a party moving for summary judgment must file a Statement of Material Facts (SMF) "set[ting] forth each relevant, material fact in a separately numbered paragraph" and supporting each fact with "specific citation(s) to

the record." SDIL-LR 56.1(a). Parties opposing summary judgment, on the other hand, must file a "Response to Statement of Material Facts" either admitting, disputing, or identifying as unsupported by the record each fact or portion of a fact in the movant's SMF. SDIL-LR 56.1(b). Defendants complied with these rules. (Doc. 157, at 3–8; Doc. 159, at 1–4). Mason did not. (*See* Doc. 168). The Court, therefore, considers the facts in Defendants' SMFs undisputed for the purposes of this order. SDIL-LR 56.1(g) ("All material facts set forth in a [SMF] . . . shall be deemed admitted for purposes of summary judgment unless specifically disputed."); *see also* FED. R. CIV. P. 56(e) (permitting courts on summary judgment to consider facts improperly addressed by an opposing party as undisputed).

Second, Mason failed to support his factual assertions through citations to the record. Like Defendants' briefs, Mason's ostensibly cites to attached exhibits. (*See, e.g.*, Doc. 168, at 4). But Mason filed his brief without any exhibits attached. Of Mason's seven purported exhibits, the Court could only identify three elsewhere in the record.[12] Where Mason's factual assertions rely on evidence the Court could not locate

---

[12] Mason's brief refers to seven exhibits, which he labels A through G. He identifies Exhibit A as the transcript of his deposition testimony (Doc. 168, at 4); Exhibit B as the transcript of Defendant Snell's deposition testimony, *id.*; Exhibit D as the transcript of Defendant McCarthy's deposition testimony, *id.* at 6; Exhibits E and F as correspondence received from IDOC, *id.* at 7; and Exhibit G as the transcript of one Major Shaun Gee's deposition testimony, *id.* Mason does not identify Exhibit C, *id.* at 5, but the Court has deduced that Exhibit C would have contained at least some of the documents attached to Mason's original complaint (Doc. 1-1). At least some of purported Exhibit C, therefore, constitutes evidence in the record. Similarly, as copies of the depositions of Mason and Snell were filed as exhibits to both motions for summary judgment (Docs. 159-1, 159-6, 157-2), Mason's Exhibits A and B are also in the record. But the Court could not locate anywhere in the record transcripts of McCarthy's or Gee's deposition testimony. Nor could the Court find copies of the referenced correspondence from IDOC. Mason's Exhibits D through G, therefore, are not part of the record reviewed on summary judgment.

(or does not have), those assertions are unsupported within the meaning of the local rules and were therefore disregarded.[13] SDIL-LR 56.1(f); *see also* FED. R. CIV. P. 56(e)(2).

## A. Count I: First Amendment retaliation by Defendants McCarthy, Snell, Fenton, Lashbrook, and Fitzgerald

Mason alleges that McCarthy, Snell, Fenton, Lashbrook, and Fitzgerald individually and collectively violated his rights under the First Amendment by retaliating against him for engaging in protected speech. (Doc. 77, ¶ 70). Retaliatory official action violates the Constitution, even if the officer would be otherwise authorized to take that action in the absence of a retaliatory motive. *See Zimmerman v. Tribble*, 226 F.3d 568, 573 (7th Cir. 2000).

To prevail on this claim, Mason must establish three elements: "First, he must show he engaged in protected First Amendment activity. Second, he must show an adverse action was taken against him. Third, he must show his protected conduct was at least a motivating factor of the adverse action." *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020).

To satisfy the second element, the adverse action must be sufficiently severe under "an objective test: whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020) (quoting *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011)). This is "generally a question of fact" inappropriate for resolution at

---

[13] Relatedly, some of the factual assertions in Mason's brief are supported only by citation to allegations in his amended complaint. (*See, e.g.*, Doc. 168, at 12–13). But allegations in the pleadings are not evidence for the purpose of establishing a dispute of material fact. *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 135 (7th Cir. 2011) (citations omitted). Those assertions, too, were disregarded.

summary judgment, but it can be resolved as a matter of law "when the asserted injury is truly minimal." *Id.* at 647 (citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).

The burden of proof on the third element is split between the parties. *See Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009). First, a plaintiff must show his protected activity was at least a motivating factor in the retaliatory action taken against him. *Id.* (citing *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)). The burden then shifts to the defendants to show they would have taken the action anyway, regardless of the improper motive. *Id.* (citing *Hasan v. U.S. Dep't of Lab.*, 400 F.3d 1001, 1005–06 (7th Cir. 2005)).

The IDOC defendants begin by making a couple of arguments applicable to all defendants on Count I. Neither is persuasive.

First, they say Mason failed to establish that he engaged in protected speech. (Doc. 157, at 11). But the Seventh Circuit "ha[s] held that inmates have a right under the First Amendment to 'seek administrative or judicial remedies of conditions of confinement.'" *Holleman*, 951 F.3d at 878 (quoting *Babcock v. White*, 102 F.3d 267, 276 (7th Cir. 1996)). Mason identifies two prior lawsuits—*Mason v. Orange Crush Officers*, No. 17-cv-1026, and *Mason v. Freeman*, No. 18-2029—as the protected speech which he claims led to the alleged retaliation. (Doc. 168, at 5; Doc. 77, ¶¶ 22, 52, 62; *see also* Doc. 168, at 4 (representing that "[t]hose two complaints, both filed in 2018, are the specific protected speech that Mason alleges caused the IDOC Defendants to retaliate against

him")). This is sufficient to meet Mason's burden on the first element of his retaliation claim at the summary judgment stage.[14]

The IDOC defendants next argue Mason cannot establish the second element as to any defendant. (Doc. 157, at 11). After the alleged retaliation, Mason continued to engage in protected speech by filing administrative grievances and lawsuits. (Doc. 157, ¶ 35). This proves, according to them, that Mason cannot demonstrate he suffered an adverse action "likely deter a person of ordinary firmness from continuing to engage in protected activity," because he was in fact not deterred. *Surita*, 665 F.3d at 878. But that is not how objective standards work. The relevant question is not whether Mason was deterred but whether a person of ordinary firmness *would* have been. As the Seventh Circuit has explained, "a contrary rule would stymie every First Amendment retaliation suit: Only plaintiffs who refuse to be silenced make their way to federal court." *Douglas*, 964 F.3d at 646–47 (citing *Van De Yacht v. City of Wausau*, 661 F. Supp. 2d 1026, 1034 (W.D. Wis. 2009)). Mason's continued exercise of his rights does not doom his suit to vindicate them.

The IDOC defendants next raise several defendant-specific arguments for summary judgment on Mason's retaliation claim, addressed below.

---

[14] The IDOC defendants also argue that Mason was required to identify, with greater specificity, which instances of his protected speech caused which instances of retaliation. (Doc. 157, at 11). But that argument goes to the third element (whether an alleged retaliatory act was motivated by protected speech) rather than the first (whether protected speech occurred at all).

i. *McCarthy*

Mason claims that Defendant Nathan McCarthy retaliated against him by threatening him. Allegedly, on November 7, 2018, McCarthy walked past Mason's cell twice, each time telling him "you're dead." (Doc. 157, ¶ 10). Mason alleges that McCarthy made these threats in response to a lawsuit Mason had filed against a coworker of McCarthy's.[15] (Doc. 157, ¶ 11; Doc. 159-1, at 10).

The IDOC defendants challenge Mason's claim on two grounds. (Doc. 157, at 12–13, 15). First, they argue that Mason completely failed to provide evidence that McCarthy's conduct was motivated by Mason's protected speech—the third element of a retaliation claim. *Id.* at 12–13. A complete failure of proof on an element of Mason's claim would require summary judgment in McCarthy's favor. *Celotex Corp.*, 477 U.S. at 322–23 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). Second, the IDOC defendants contend that "mere threats are insufficient" to constitute adverse action under the second element. (Doc. 157, at 15).

---

[15] Mason's complaint alleges that McCarthy was a defendant in a prior lawsuit, but Mason testified at his deposition that it was McCarthy's coworker who had been named (Doc. 159-1, at 10). The IDOC defendants' undisputed SMF reflects Mason's testimony. (Doc. 157, ¶ 11).

In their first argument, the IDOC defendants explain that the record lacks any evidence that could establish McCarthy's conduct was motivated by Mason's lawsuits. *Id.* at 13. They point out that the record only contains Mason's speculation that McCarthy was retaliating because Mason had named one of McCarthy's coworkers in a lawsuit.[16] (Doc. 157, ¶ 11; Doc. 159-1, at 10). Because speculation cannot save a plaintiff from summary judgment, it was incumbent on Mason to identify other evidence in the record to establish that McCarthy's actions were motivated by the lawsuits. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." (citing *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996))).

Mason does not just fail to identify such evidence—he fails to respond to the IDOC defendants' first argument at all. (*See* Doc. 168, at 6–8 (focusing entirely on whether McCarthy made the threats, which goes to the second element)). A failure to respond to

---

[16] The entirety of the relevant portion of Mason's deposition testimony is reproduced below:

> Q: Let's start with Nathan McCarthy, why do you believe Nathan McCarthy was retaliating against you?
> A: Because I named one of his staff members that assaulted me. And they both worked for internal affairs or intel.
> Q: Do you have any evidence that any of the actions that you claim that Mr. McCarthy took are a result of you naming one of his co-workers?
> A: Repeat that?
> Q: Do you have any—well, let['s] back up then. So you believe that he retaliated against you for naming one of his co-workers. What actions do you allege that Mr. McCarthy took that were acts of retaliation?
> A: The threats.
> Q: And what threats?
> A: He walked pas[t] my cell twice and said I'm dead. Why would he say that and I never had any interaction with him. This is just my belief, you know.

(Doc. 159-1, at 10).

an argument on summary judgment is a waiver of that argument. *E.g.*, *Hartford Underwriters Ins. Co. v. Worldwide Transp. Shipping Co.*, 313 F. Supp. 3d 919, 925 (N.D. Ill. 2018) (citing *C & N Corp. v. Kane*, 756 F.3d 1024, 1026 (7th Cir. 2014)). Mason's lack of response, then, is deemed an admission that there is no non-speculative evidence in the record that indicates McCarthy was motivated by Mason's lawsuits against the coworker.

Because of Mason's complete failure of proof on an essential element of his claim, there is no genuine dispute of material fact. The Court therefore grants summary judgment for McCarthy.[17]

      ii.  *Snell*

Mason claims that Defendant Justin Snell retaliated against him for exercising his First Amendment right to file lawsuits. (Doc. 77, ¶¶ 22, 29–34, 44, 61–62, 65–72). He alleges that Snell was motivated by having been named as a defendant in two of Mason's prior lawsuits. *See id.*

Though Mason's account of Snell's adverse actions has seemed to shift over time,[18] the IDOC defendants do not challenge the second element of Mason's claim. (For the

---

[17] Because summary judgment is warranted on the third element of Mason's claim, the Court does not reach the IDOC defendants' other asserted grounds for summary judgment.

[18] As best the Court can discern, Mason alleges in his amended complaint that Snell retaliated against him by:

- Denying his requests to speak to a lieutenant or major;
- Ordering Defendant Fenton to confiscate his ID card;
- Ordering him to be sent to segregation;
- Testifying against him falsely in disciplinary proceedings;
- Calling him a "snitch bitch" and identifying him as a "snitch" in front of other inmates;
- Denying him access to the law library; and
- Writing a false disciplinary report against him.

purposes of this order, the Court assumes without deciding that the disciplinary report Snell filed against Mason following the law library incident is the adverse action at issue.) Instead, they argue Snell is entitled to summary judgment on the third element: whether his conduct was motivated by Mason's protected speech. (Doc. 157, at 13–14). They support this challenge with two assertions: (1) Snell could not have been motivated by Mason's lawsuits against him because he was not yet aware of it; and (2) Mason would have been disciplined regardless of Snell's motivation because Mason had violated the prison's rules. *Id.* at 13–14.

The IDOC defendants support their first argument with reference to the docket in Mason's two lawsuits. *Id.*; *see also id.* ¶¶ 18–20. Snell never received service of Mason's first suit. *Id.* ¶ 19. And Snell only signed the waiver of service (indicating receipt of the complaint) for Mason's second suit roughly two months after the events at issue. *Id.* ¶ 20. From this, the IDOC defendants reason that Snell could not have been motivated by Mason's protected speech, because he was unaware of it when he wrote the disciplinary report. *Id.* at 13–14.

---

(Doc. 77, ¶¶ 31–33, 38, 51, 61, 63, 70). In his later deposition, Mason was asked what Snell did to retaliate against him. (Doc. 159-1, at 11). He identified the following actions by Snell:

- Sending him to segregation; and
- Writing a false disciplinary report against him.

*Id.* Still later, Mason's response to the motion for summary judgment states that Snell retaliated against him by issuing a more severe disciplinary report than was required by Mason's conduct. (Doc. 168, at 4). Mason also seems to imply that Snell retaliated by having him sent to the West Cellhouse, which was for "high aggression" inmates. *Id.* at 5–6. (This in spite of Mason's deposition testimony that he did not know who assigned him to the West Cellhouse. (Doc. 159-1, at 15).) In other words, the second element of Mason's claim against Snell has been a bit of a moving target.

However, just because Snell had not yet been served does not mean he could not have learned of its existence.[19] As Mason points out in his response brief (Doc. 168, at 4), Snell testified that he could not recall when he learned about the lawsuit (Doc. 159-6, at 35). In contrast, both a contemporaneous sworn letter to the prison administration and Mason's deposition testimony reflect that Snell told Mason "you listed me as a defendant" immediately before writing the disciplinary report. (Doc. 1-1, at 19; Doc. 159-1, at 11). Though Snell testified that he would not have said something like that, he also acknowledged that he did not remember everything that occurred that day. (Doc. 159-6, at 30–32).

Resolving the conflicting evidence in the record in Mason's favor, a reasonable jury could absolutely determine that Snell's adverse actions were motivated at least in part by Mason's protected speech. There is therefore a dispute of material fact precluding summary judgment on this issue.

Seizing upon the latter half of the third element's burden-shifting framework, the IDOC defendants next point to Menard's Procedural Bulletin. (Doc. 157, at 14). Mason does not dispute that he attempted to bring envelopes to the law library, which was forbidden by the Bulletin. According to the Bulletin, then, Snell had to issue Mason a disciplinary report. The IDOC defendants thus argue that Mason would have been subjected to the adverse action regardless of Snell's motives. *Id.*

---

[19] (*See* Doc. 159-6, at 35 (indicating that one of Mason's complaints against Snell had been "scanned at Menard" on October 29, 2018—weeks before the law library incident and disciplinary report).

This, too, is subject to a dispute of material fact, because Mason proffers evidence that Snell would have punished him less harshly absent a retaliatory motive. Snell charged Mason with two violations: a Code 206 for "intimidation and threats" and a Code 215 for "disobeying a direct order essential to safety and security." (Doc. 157, ¶ 16; Doc. 157-4). Mason points to Snell's deposition testimony to show that these violations were of a higher severity than was warranted by Mason's actual behavior. (Doc. 168, at 4; Doc. 159-6, at 19–27).

For example, an element of Code 215 appears to be that the prisoner's refusal to obey orders results in the use of force by correctional officers. (Doc. 159-6, at 21–22). However, Snell testified that no force was used during the incident and that the disciplinary report did not reference the use of force. (*Id.* at 21; *see also* Doc. 1-1, at 15 (copy of disciplinary report)). There is a different, less severe violation code for refusing to obey an order that does *not* result in the use of force: Code 313. (Doc. 159-6, at 22). Snell could have used that charge in his disciplinary report but elected not to do so. When viewed in the light most favorable to Mason, Snell's decision supports an inference that Mason was punished more harshly than he might otherwise have been but for a retaliatory motive.

Because Mason has proffered evidence placing the second prong of the third element into dispute, summary judgment is inappropriate.

  iii. *Fenton*

The record evinces some confusion about what, exactly, Defendant Zachary Fenton allegedly did. The IDOC defendants say the "only allegation against Defendant

Fenton pertains to his involvement with the November 18, 201[8] incident regarding envelopes and the law library. Defendant Fenton's involvement in the exchange is limited to him taking [Mason's] ID when Defendant Snell issued the disciplinary ticket." (Doc. 157, at 18).

As with Snell, Mason's account of Fenton's actions has shifted over time. From a laundry list of actions in the amended complaint[20] (Doc. 77), Fenton's allegedly retaliatory conduct is whittled down by the time of Mason's deposition to (1) his participation in the law library incident by taking Mason's ID and (2) leaving Mason in the segregation cell after Mason told him about the cell's condition.[21] (Doc. 159-1, at 11–12).

In his response brief, Mason does not directly acknowledge or refute the IDOC defendants' assertion that Fenton's only retaliatory conduct was his involvement in the law library incident. (*See* Doc. 168, at 3–9). In fact, Mason never expressly discusses the

---

[20] Mason alleges in his amended complaint that Fenton retaliated against him by:
- Participating in the denial of law library access;
- Refusing to permit Mason to speak with a lieutenant or major about library access;
- Threatening to send Mason to segregation ("I'm going to send your ass to segregation behind the door.");
- Promising someone would bring Mason his toiletries in segregation (while no one actually did);
- Conducting a strip-search of Mason in a medical holding area while female staff walked in and out of the area;
- Ignoring complaints about the inhumane conditions in the segregation cell while saying "[t]hat's what happens when you're a pain in the ass and file lawsuits here at Menard";
- Ignoring requests to speak with a sergeant, lieutenant, or major about the conditions in his segregation cell; and
- Testifying falsely against Mason in disciplinary proceedings against him.

(Doc. 77, ¶¶ 31–33, 36–37, 39, 41, 43, 51–52, 54, 70). Mason also alleges that Fenton brought him to segregation, though Fenton allegedly explained it was on Snell's orders and that Fenton had had nothing to do with it. *Id.* at 34.

[21] According to Mason's testimony, however, Fenton *did* bring Defendant Cannon to see him after he notified Fenton of the cell's conditions. (Doc. 159-1, at 12). He just faults Fenton for failing to do more. *Id.*

retaliatory nature of Fenton's conduct. *See id.* He only references Fenton's actions by way of an argument concerning unpreserved video footage.[22] *Id.* at 7–9. He specifically states that unpreserved video footage "would have captured Snell and Fenton's actions [as written] in a sworn declaration sent to the Adjustment Committee on November 27, 2018." *Id.* at 7. You could choose to read that reference to the declaration as incorporating the declaration's assertions into Mason's responsive brief. If you did, you might then find (if you squinted) that Mason had responded to the IDOC defendants' description of Fenton's retaliatory actions by evidencing one more allegation: that Fenton had threatened Mason by saying he was "going to send [Mason's] ass to seg[regation] behind the door."(Doc. 1-1, at 20).

The IDOC defendants challenge Mason's claim on three grounds. First, they argue Mason failed to provide any evidence establishing the third element (that Fenton was motivated by Mason's protected speech). (Doc. 157, at 12–13). Second, they argue Fenton was insufficiently personally involved to be held liable under 42 U.S.C. § 1983. *Id.* at 15–18. And third, they argue Fenton's adverse actions were insufficiently severe to be retaliatory, meaning Mason cannot satisfy the second element as a matter of law. *Id.* at 18.

In their first argument, the IDOC defendants point to Mason's deposition testimony and explain that the record contains nothing beyond mere speculation to establish that Fenton's conduct was motivated by Mason's lawsuits. *Id.* at 13.

---

[22] Mason makes an apparent spoliation argument and asks for an adverse inference based on this unpreserved footage. (Doc. 168, at 7–9). Because resolution of Mason's request would not affect the disposition of the instant motions for summary judgment, the Court declines to consider it at this time. Mason is free to renew his argument at a later date.

As with his claim against Defendant McCarthy, however, Mason fails entirely to respond to the IDOC defendants' argument. (*See* Doc. 168, at 3–9). He does not point to any evidence that Fenton was motivated by his prior lawsuits, or even that Fenton was aware of them.[23] *See id.* He does not respond to the IDOC defendants' argument about Fenton's motivations at all. Mason's only argument about Fenton concerns the allegedly unpreserved video. (Doc. 168, at 7–9). Mason claims he is entitled to an adverse inference that the unpreserved video shows Fenton taking adverse action against him—not that the adverse action was motivated by his protected speech. *Id.*

Mason's silence in the face of the IDOC defendants' challenge is a waiver of the argument. Fenton "is 'entitled to a judgment as a matter of law' because [Mason] has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof."[24] *Celotex Corp.,* 477 U.S. at 323.

    iv.  *Lashbrook*

Perhaps unsurprisingly, the allegations against Defendant Jacqueline Lashbrook are also muddled. Mason alleges in his amended complaint that Lashbrook, Menard's Warden, retaliated against him by approving the results of the disciplinary proceedings against him. (Doc. 77, ¶¶ 54, 70). But in his deposition, Mason testified that Lashbrook's retaliation was based on her knowledge of and inaction toward the retaliatory acts of other Menard staff. (Doc. 159-1, at 12–13). In their SMF, the IDOC defendants characterize

---

[23] Indeed, a review of the relevant portion of Mason's deposition testimony reveals that he had never sued Fenton before and that Fenton had never mentioned the previous lawsuits. (Doc. 159-1, at 12).

[24] Because summary judgment is warranted on the IDOC defendants' first ground (failure to make a sufficient showing on the motivating factor element), the Court does not reach their second two grounds.

Mason as alleging that Lashbrook "retaliated against him because she did not stop her staff from retaliating against him after reviewing his grievances." (Doc. 157, ¶ 33). Mason does not dispute this characterization in his response. (*See* Doc. 168).

The IDOC defendants argue Lashbrook is entitled to summary judgment for two reasons. First, they argue Mason failed to offer sufficient evidence of Lashbrook's allegedly retaliatory motivation. (Doc. 157, at 12–13). Second, they argue Mason failed to provide any evidence that Lashbrook was sufficiently personally involved in the allegedly retaliatory actions of other Menard staff to be liable under § 1983.[25] (Doc. 157, at 15–18).

Mason does not respond to any of the IDOC defendants' arguments about Lashbrook. (*See* Doc. 168). He lists her name as one of the IDOC defendants in the introduction a few times, *id.* at 1–2, but otherwise does not even mention Lashbrook or his claim against her. Once again, Mason's failure to respond waives the argument, and the Court grants summary judgment for Lashbrook.

### v. *Fitzgerald*

Mason alleges that Defendant Zachary Fitzgerald, a defendant in one of Mason's prior lawsuits (Doc. 159, at 13–14), retaliated against him by ignoring his complaints about his cell in the West Cellhouse. (Doc. 77, at 60, 62, 70). Specifically, Mason's cell

---

[25] Only someone who causes or participates in an alleged constitutional deprivation is liable under § 1983. *See, e.g.*, *Greeno v. Daley*, 414 F.3d 645, 656-57 (7th Cir. 2005); *see also Zemlick v. Burkhart*, ___ F.4th ___, 2026 WL 172617, at *4 (7th Cir. Jan. 22, 2026) ("'[S]upervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not' directly liable [under § 1983] because mere negligence is not enough. Rather, the 'supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'" (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988))).

lacked cold water and occasionally smelled of Mace; when Mason informed him,[26] Fitzgerald allegedly did nothing.

The IDOC defendants challenge Mason's retaliation claim against Fitzgerald on two grounds. The first is that Mason failed to supply sufficient evidence to establish that Fitzgerald's conduct was motivated by Mason's protected speech. (Doc. 157, at 12–13, 19). The second is that Mason cannot establish sufficient personal involvement for Fitzgerald to be liable under § 1983. *Id.* at 19.

To support their first argument, the IDOC defendants point out that the sum total of Mason's evidence for retaliatory motivation is that Fitzgerald was a defendant in one of Mason's prior lawsuits. (Doc. 157, at 13). The leap from "Fitzgerald was a defendant" to "Fitzgerald was retaliating against me because he was a defendant" is, according to the IDOC defendants, pure speculation. *Id.* Indeed, Mason acknowledged in his deposition that Fitzgerald never mentioned the lawsuit to him and provided no further evidence or reasoning. (Doc. 159-1, at 13–14).

Once again, Mason does not respond to this argument. (*See* Doc. 168). As above, so below. Mason's failure to respond waives his chance to rebut the IDOC defendants' challenge. Because he fails to provide any evidence to establish the third element of his claim, the Court grants summary judgment for Fitzgerald.[27]

---

[26] Mason testified both that he could not remember whether he told Fitzgerald about the smell of Mace and that he did tell him. (*Compare* Doc. 159-1, at 13, *and* Doc. 157, ¶ 26, *with* Doc. 159-1, at 18, *and* Doc. 157, ¶ 31). Mason testified that he *did* tell Fitzgerald about the water, however. (Doc. 159-1, at 16).

[27] Because summary judgment is warranted on the IDOC defendants' first ground (failure to make a sufficient showing on the motivating factor element), the Court does not reach their second ground.

**B. Count II: Deliberate indifference to inhumane conditions of confinement in segregation by Defendant Cannon**

Mason alleges he was subjected to unconstitutional conditions of confinement while in segregation. (Doc. 77, ¶¶ 39–40, 42–43, 47–48, 53). For six of the nine days, he alleges he was left without a towel, bedding, a toothbrush, toothpaste, soap, boxers, shirts, shower shoes, or tissue. *Id.* ¶¶ 39, 47. For the entire nine days, his cell "was extremely cold and lacking any heat" and featured "dried blood on the walls and a bed mat stained with blood." *Id.* ¶¶ 40, 79. But according to Mason's amended complaint, not only did Defendant Morgan Cannon ignore him when he complained, she affirmatively lied about his concerns in her reports. *Id.* ¶¶ 42–43, 48.

Under the Eighth Amendment, "[p]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). While the Constitution does not mandate comfortable prisons, it does not permit inhumane ones. *Farmer*, 511 U.S. at 832 (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

To establish a prima facie case for an Eighth Amendment conditions of confinement claim, a plaintiff inmate must satisfy two elements. The inmate must "first establish an '<u>objective</u> showing that the conditions are sufficiently serious—*i.e.*, that they deny the inmate "the minimal civilized measure of life's necessities," creating an excessive risk to the inmate's health and safety.'" *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019) (emphasis added) (quoting *Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017)).

Restrictive, harsh, or uncomfortable prison conditions that are neither cruel nor unusual are "part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347. A prisoner is not entitled to "the amenities, conveniences and services of a good hotel." *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988).

Second, the inmate must also "establish 'a <u>subjective</u> showing of a defendant's culpable state of mind.' . . . [T]he state of mind necessary to establish liability is deliberate indifference to the inmate's health or safety." *Giles*, 914 F.3d at 1051 (emphasis added) (quoting *Isby*, 856 F.3d at 521) (citing *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000)). "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Deliberate indifference "implies at a minimum actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985). Mere "negligence or even gross negligence does not constitute deliberate indifference." *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). "There is no liability under the Cruel and Unusual Punishments Clause if a prison official has responded reasonably to a risk of harm." *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir. 1997).

Cannon challenges two portions of Mason's claim. First, she argues she is entitled to summary judgment because Mason cannot make an objective showing that the

conditions in his cell were sufficiently serious (the first element). (Doc. 159, at 6–12). Second, she argues she was insufficiently personally involved to be held liable under 42 U.S.C. § 1983. *Id.* at 12–13.

Cannon's first argument is not persuasive. She argues that the cold temperatures Mason alleges are insufficiently serious as a matter of law, likening this case to *Mays v. Springborn*, 575 F.3d 643 (7th Cir. 2009), where the Seventh Circuit affirmed a grant of summary judgment against a cold-related conditions of confinement claim. (Doc. 159, at 7). But Cannon misunderstands the law: In the Seventh Circuit, courts are to consider five factors when evaluating a conditions of confinement claim based on extreme cold: "(1) the severity of the cold; (2) its duration; (3) whether the prisoner has alternative means to protect himself from the cold; (4) the adequacy of such alternatives; and (5) whether the prisoner must endure other uncomfortable conditions in addition to the cold." *Dace v. Smith-Vasquez*, 658 F. Supp. 2d 865, 876 (S.D. Ill. 2009) (citing *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997). The *Mays* Court was confronted with different facts; that it reached a different conclusion under such a fact-intensive inquiry should be unsurprising.[28]

---

[28] Specifically, *Mays* concerned a plaintiff upset that he was not issued enough winter gear—only "a winter coat, boots, and a winter hat." *Mays*, 575 F.3d at 646. The Seventh Circuit affirmed the grant of summary judgment against him. *Id.* at 651. It reasoned that, in the absence of any evidence that Mays "was forced to be in the cold for long periods of time or that he suffered anything more than the usual discomforts of winter," the evidence Mays *did* provide (testimony that "because he was never issued certain clothing items, he suffered from hurt ears and numb hands, felt frostbite, and caught colds") was not enough. *Id.* at 648. Here, where Mason has testified that he experienced similar symptoms after being confined in an extremely cold segregation cell without any bedding for days on end (Doc. 159-1, at 22, 26), the evidentiary situation is completely different than in *Mays*.

So, if Mason's allegations are not categorically insufficient, the evidence in the record must be assessed. Mason provided evidence, in his testimony, that his cell was extremely cold and that he was not given any sheets or blankets for his bed. (Doc. 159-1, at 22, 26). He testified that these conditions caused him physical harm. *Id.* at 26.

In response, Cannon does not point to any evidence about the conditions of Mason's cell. Instead, she merely insists that Mason's lack of "objective data" (such as "temperature logs") is fatal to his claim. (Doc. 159, at 7–8; Doc. 169, at 3). But Mason does not have to provide "objective data."[29] *See* FED. R. CIV. P. 56(c)(1) (factual assertions on summary judgment to be supported by "materials in the record, including depositions"). Cannon points to no opinion of the Seventh Circuit establishing a heightened evidentiary burden at summary judgment for plaintiffs alleging extreme cold.

While declining to say it could never be resolved on summary judgment, the Seventh Circuit has emphasized that "the question of whether the severity of the cold, in combination with the length of time which the inmate had to endure it, was sufficient to violate the Eighth Amendment is one which will often be peculiarly appropriate for resolution by the trier of facts." *Dixon*, 114 F.3d at 643. Here, where Mason has pointed to materials in the record to support his allegations of extreme cold (and where Cannon has

---

[29] Cannon cites *Dace v. Smith-Vasquez*, which does not impose such a requirement. 658 F. Supp. 2d at 876–81. On different facts and confronted with a completely different evidentiary record, the *Dace* Court said only that "the lack of objective data on the actual temperatures in his cell undermines the meaningfulness of [his] claims." *Id.* at 879; *see also Sanford v. Madison Cnty. Jail*, No. 14-cv-566, 2017 WL 894474, at *5 (S.D. Ill. Mar. 7, 2017) (distinguishing *Dace* because the plaintiff there had winter clothing and bedding to keep him warm).

failed to demonstrate those materials' inadequacy), the question must go to the trier of fact.

Cannon's second challenge to Mason's claim is no more persuasive than her first. While she correctly notes that, under § 1983, "[a] defendant 'cannot be held liable for failing to do something he had no authority to do'" (Doc. 159, at 12 (quoting *Hunter v. Mueske*, 73 F.4th 561, 566 (7th Cir. 2023))), Cannon appears to misread Mason's claim against her. She points to the undisputed fact that she did not have the authority to rectify any of Mason's complaints about his segregation cell. (Doc. 159, ¶¶ 5–12). But Mason isn't suing her for failing to rectify the issues with his cell—he's suing her for failing to report them. (Doc. 77, ¶¶ 42–43, 48; Doc. 168, at 14).

Though a defendant cannot be held liable for failing to do something she had no authority to do, she *can* be held liable for failing to do something she *did* have the authority to do. *See, e.g.*, *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (using "a complaint examiner [who] routinely sent each grievance to the shredder without reading it" as an example of a defendant who could be liable for deliberate indifference under § 1983). Here, Cannon's own undisputed SMF establishes that she had not only the authority but the "responsibility" to report issues like those Mason claims to have experienced.[30] (Doc. 159, ¶¶ 7–12).

---

[30] Specifically, Cannon writes that:
- "Cannon was not responsible for cleaning cells; her only responsibility was to document the complaints about the cell and share the complaint with an IDOC staff member. Same was true for blood stains." (Doc. 159, ¶ 7).
- "[H]er authority only extends to documenting and reporting his complaints." *Id.* ¶ 8.
- "Cannon's only responsibility was to document the complaints about the temperature and orally share the complaint with an IDOC staff member." *Id.* ¶ 9.

Mason claims Cannon failed to report his complaints about the conditions in his segregation cell and even actively falsified her reports. (Doc. 77, ¶¶ 73–80; Doc. 159, ¶ 4). In other words, he alleges she willfully turned a blind eye to the conditions he faced and refused to relay his concerns to anyone who *could* have rectified his complaints. And Mason has put evidence in the record to support this claim. (*Compare* Doc. 159-1, at 22 (Mason testifying that he told Cannon about the conditions in his cell), *with* Doc. 1-1, at 18 (a copy of Cannon's report, on which she wrote his cell conditions were good and that he said to her "I'm good"), *and* Doc. 159-2, at 23 (Cannon testifying, upon viewing a copy of her report, that she would not have falsified it and that the phrase "I'm good" is a direct quote from Mason)). Cannon therefore cannot establish that she is entitled to judgment as a matter of law on the personal involvement requirement.

Because neither of Cannon's arguments persuades the Court that there is no dispute of material fact, her motion for summary judgment is denied.[31]

## C. Count III: Deliberate indifference to inhumane conditions of confinement in the West Cellhouse by Defendants Fitzgerald and Royster

Mason alleges in his third count that he was deprived of cold water and subjected to the smell of Mace in the West Cellhouse. (Doc. 77, ¶¶ 57–64, 81–86). He asserts that

---

- "Cannon did not control access to personal items while in segregation; her only responsibility was to document an individual in custody's complaints about personal items and share the complaint with an IDOC staff member." *Id.* ¶ 11; *see also id.* ¶ 12 (same verbatim).

[31] Cannon argues in her reply that Mason "waived any argument against Cannon's motion for summary judgment because he did not address any of the arguments" in her motion outside of "one single paragraph of [his] fifteen page brief." (Doc. 169, at 2 (citing Doc. 168, at 14)). This is incorrect. Mason's argument entitled "Mason was detained in objectively adverse conditions," which spans three pages, is also clearly responding to Cannon's argument. (Doc. 168, at 10–12). Moreover, Mason's argument in the paragraph Cannon cites points to record evidence that is clearly responsive to Cannon's claimed lack of personal involvement. In other words, Mason did not waive his arguments in response to Cannon's motion.

these conditions were unconstitutionally inhumane. (Doc. 168, at 12–13). He further alleges Defendants Zachary Fitzgerald and Philip Royster were deliberately indifferent to those conditions by ignoring his complaints (Doc. 77, ¶¶ 81–86).

The IDOC defendants challenge the first element of Mason's conditions of confinement claim. (Doc. 157, at 19–22). They argue Mason has failed to provide enough evidence to create a dispute of fact about whether his conditions of confinement were sufficiently severe. The Court agrees.

Mason's evidence shows he had difficulties with the water in his cell for 17 days. (Doc. 157, ¶¶ 21, 25). But Mason's evidence is inconclusive as to the nature of these difficulties. (*See* Doc. 159-1, at 15–16). In his complaint, Mason alleged that the cold water in his cell sink stopped running. (Doc. 77, ¶ 58). But he testified that he could not remember whether his hot water still worked or whether his sink had stopped working entirely. (Doc. 157, ¶ 23; Doc. 159-1, at 15–16). Regardless, it is undisputed that (1) Mason's toilet still functioned and (2) he was able to get water from inmates in the neighboring cells for all his washing, cooking, and drinking needs.[32] (Doc. 157, ¶¶ 23–24; Doc. 159-1, at 16).

In other words, the undisputed evidence establishes *only* that Mason was inconvenienced in using water. It does not establish that he was deprived of water for

---

[32] From Mason's deposition:
  Q: Was there anything that you weren't able to do because you didn't have water?
  A: The normal stuff that we do every day. Like when I want to cook, I got to get everything—I got to get the water from next door.
  Q: Were you able to get that water though?
  A: From next door, yes.
(Doc. 159-1, at 16).

any necessary purpose. Though the first element of a conditions of confinement claim is generally fact intensive, no reasonable jury could conclude that this inconvenience denied Mason the "minimal civilized measure of life's necessities" or "create[ed] an excessive risk to [his] health and safety."[33] *Giles*, 914 F.3d at 1051 (quoting *Isby*, 856 F.3d at 521).

A similar conclusion is compelled with respect to the smell of Mace. Mason does not offer any evidence to suggest that the smell, alone or in combination with his lack of cold water, was anything more than an inconvenience or irritation. His only response to the IDOC defendants' challenge is to cite two inapplicable cases from the "excessive force" context.[34] Even viewed in the light most favorable to Mason, no reasonable jury could find that Mason had experienced objectively inhumane conditions on these facts.

Mason has failed to provide sufficient evidence to establish that the conditions in the West Cellhouse denied him the minimal civilized measure of life's necessities.

---

[33] Mason offers two cases to support his position that the difficulties with his sink amounted to an Eighth Amendment violation: (1) *Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007) (per curiam) (plaintiff was kept for six days without any mattress, sheets, toilet paper, towels, shoes, soap, or toothpaste in a cell where the "floor . . . was covered with water, the sink and toilet did not work, and the walls were smeared with blood and feces"), which Mason cites for the propositions that "a non-functional sink may violate the Eighth Amendment"; and (2) *Owens v. Lamb*, No. 17-cv-997, 2020 WL 1492690 (S.D. Ill. Mar. 27, 2020) (plaintiff was kept for months in a cell where a leak frequently caused him to be exposed to contaminated water), which Mason cites for the proposition that "unhygienic conditions over a longer period of time raise serious constitutional concerns." (Doc. 168, at 13). Leaving aside the fact that the plaintiffs in both of these cases faced potentially very serious health risks, as opposed to a mere lack of access to cold water, Mason's own testimony establishes that he was not actually deprived of anything. (Doc. 159-1, at 16). It is undisputed that he was able to get all the water he needed—he just had to get it from other inmates' cells. (Doc. 157, ¶¶ 23–24). Mason points to no evidence to show he suffered anything but inconvenience and musters no caselaw to show the Constitution was violated.

[34] Even if those cases, *Kuykendall v. Kennell*, No. 14-1477, 2015 WL 1887507 (C.D. Ill. Apr. 24, 2015), and *Soto v. Dickey*, 744 F.2d 1260 (7th Cir. 1984), were applicable here, Mason himself correctly points out that they require a plaintiff to show "prison officials use[d] chemical agents for the sole purpose of punishment or the infliction of pain." (Doc. 168, at 13). Mason does not make such a showing. (*See* Doc. 157, ¶ 30).

Because Mason bears the burden of proof on that element, Fitzgerald and Royster are entitled to judgment as a matter of law on Count III.

### D. Qualified Immunity

The IDOC defendants argue additionally that they are entitled to summary judgment on qualified immunity.[35] (Doc. 157, at 22–25). Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The qualified immunity test has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *See Pearson*, 555 U.S. at 232; *see also Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). To be "'clearly established' a right must be defined so clearly that every reasonable official would have

---

[35] Defendant Cannon does not assert a qualified immunity defense. (*See* Doc. 159).

understood that what he was doing violated that right." *Dibble v. Quinn*, 793 F.3d 803, 808

(7th Cir. 2015) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). There need not be a case

directly on point, but "existing precedent must have placed the statutory or constitutional

question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The right must be

established "not as a broad general proposition." *Reichle*, 566 U.S. at 664. Instead, it must

be "particularized" such that the "contours" of it are clear to a reasonable official. *Id.*

### i.  *First Amendment retaliation (Count I)*

As discussed above, the Court found in favor of Defendants Nathan McCarthy,

Zachary Fenton, Jacqueline Lashbrook, and Zachary Fitzgerald on Count I because the

facts, when taken in the light most favorable to Mason, do not demonstrate that their

conduct violated a constitutional right. They are therefore entitled to qualified immunity

on that count.

Defendant Justin Snell, however, is not entitled to qualified immunity. Viewed in

the light most favorable to Mason, it is not clear that Snell did not violate his

constitutional rights. And a prisoner's right to file lawsuits without fear of retaliation was

clearly established at the time of the events alleged in Mason's amended complaint. *E.g.*,

*Babcock*, 102 F.3d at 276; *Holleman*, 951 F.3d at 877–78.

### ii.  *Deliberate indifference to inhumane conditions of confinement (Count III)*

As discussed above, the Court found in favor of Defendants Zachary Fitzgerald

and Philip Royster on Count III because the facts, when taken in the light most favorable

to Mason, do not demonstrate that their conduct violated a constitutional right.

Therefore, they are entitled to qualified immunity on that count.

<u>C<small>ONCLUSION</small></u>

For these reasons, the Court **GRANTS in part** and **DENIES in part** the motion for summary judgment filed by Defendants Justin Snell, Zachary Fenton, Nathan McCarthy, Zachary Fitzgerald, Philip Royster, and Jacqueline Lashbrook (Doc. 156) and **DENIES** Defendant Morgan Cannon's motion for summary judgment (Doc. 158). At the close of the case, the Clerk of Court shall enter judgment:

- On Count I, in favor of Defendants Nathan McCarthy, Zachary Fenton, Jacqueline Lashbrook, and Zachary Fitzgerald, and against Plaintiff Mickey Mason; and

- On Count III, in favor of Defendants Zachary Fitzgerald and Philip Royster and against Plaintiff Mickey Mason.

The following claims remain pending:

- Count I against Defendant Justin Snell; and

- Count II against Defendant Morgan Cannon.

The Court will set a status conference by separate order for the purpose of discussing a potential referral of this case to mediation and setting a firm trial date.

**IT IS SO ORDERED.**

**DATED:  February 13, 2026**

**NANCY J. ROSENSTENGEL**
**United States District Judge**